IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| FATIMA MARIA RAMIREZ RUANO | : |
|  | : |
| v. | : Civil Action No. DKC 23-2461 |
|  | : |
| SCRATCH KITCHEN & BISTRO, LLC, et al. | : |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment wage dispute is the motion for default judgment filed by Plaintiff Fatima Maria Ramirez Ruano ("Plaintiff") against Defendants Bernadette C. Rousseau ("Ms. Rousseau"), Vital Correia ("Mr. Correia"), and Scratch Kitchen & Bistro, LLC ("Scratch Kitchen," and collectively, "Defendants"). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion for default judgment will be granted in part and denied in part.

**I.    Background**

The background of this case is set out in detail in the court's previous memorandum opinions. (ECF Nos. 42; 65). In short, from around August 2022 to August 2023, Plaintiff worked as a cook for Scratch Kitchen, a restaurant owned and operated by Ms. Rousseau and Mr. Correia. (ECF No. 47 ¶¶ 1, 11-12). On September 11, 2023, Plaintiff filed a complaint alleging violations of the

Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*, the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab. & Empl. §§ 3-401, *et seq.*, and the Maryland Wage Payment and Collection Law ("MWPCL"), Md. Code Ann., Lab. & Empl. §§ 3-501, *et seq.* (ECF No. 1).  Plaintiff asserted federal question jurisdiction over the FLSA claims and supplemental jurisdiction over the state law claims.  Ms. Rousseau and Mr. Correia each filed a motion to dismiss.  (ECF Nos. 20, 38).  On July 24, 2024, the court granted Ms. Rousseau's motion in part and denied it in part, finding that Plaintiff had "alleged [sufficient] facts showing that she is Scratch Kitchen's and Ms. Rousseau's employee" under the FLSA and MWHL.  (ECF No. 42, at 7, 15).  The court granted Mr. Correia's motion to dismiss because Plaintiff had failed to allege sufficient facts that Mr. Correia was an employer under the FLSA and MWHL.  (*Id.* at 21).

Additionally, counsel for Scratch Kitchen was allowed to withdraw from representation.  Scratch Kitchen is an LLC, and it can only appear in this court through a licensed attorney.  Its counsel withdrew, and it failed to secure new counsel.  After giving Scratch Kitchen an opportunity to show cause why a default should not be entered against it, the court directed the clerk to enter default as to Scratch Kitchen.  (ECF Nos. 41, 43).  The individual Defendants always proceeded *pro se*.

2

On August 14, 2024, Plaintiff filed an amended complaint. (ECF No. 47). As in her initial complaint, Plaintiff continued to allege that she worked for Defendants from around August 2022 to August 2, 2023, and she "regularly and customarily worked more than fifty" hours per week. (ECF No. 47 ¶¶ 18, 25). Plaintiff further alleged that Defendants paid her between $19.00 to $20.00 an hour, "regardless of whether Plaintiff worked hours over forty each week." (*Id.* ¶¶ 26-27). Additionally, Defendants paid Plaintiff through Zelle in part "to obscure the number of hours Plaintiff worked." (*Id.* ¶ 29). Defendants also told Plaintiff "that because they classified her as a contractor, she was not legally entitled to overtime wages." (*Id.* ¶ 31). Plaintiff also alleged that Defendants knew that she was working over forty hours per week. (*Id.* ¶¶ 76, 78). Nevertheless, Defendants refused to pay her overtime wages of time and a half for the time she worked over forty hours each week. (*Id.* ¶ 75).

Plaintiff also alleged that her last day of employment was on or around August 2, 2023. (*Id.* ¶ 40). On August 10, 2023, Plaintiff sent a text message to Ms. Rousseau requesting payment of her unpaid wages. (*Id.* ¶ 41). In response, Ms. Rousseau sent Plaintiff multiple texts with expletives threatening to report Plaintiff to immigration authorities. (*Id.* ¶¶ 41-46). On August 21, 2023, Plaintiff retained counsel, and on August 30, 2023,

Plaintiff's counsel sent a demand letter to Defendants for her unpaid wages. (*Id.* ¶¶ 47-48). Plaintiff alleged that on September 7, 2023, Ms. Rousseau filed an interim peace order in the District Court of Maryland for Montgomery County seeking to prevent Plaintiff from contacting her, Mr. Correia, and all of Scratch Kitchen's contractors. (*Id.* ¶¶ 50-52).

Among other changes, Plaintiff added allegations as to Mr. Correia. (*Id.* ¶¶ 34-37). Plaintiff alleged that "[t]hroughout Plaintiff's employment, Defendant Correia was the individual with the primary responsibility for supervising Plaintiff. In this role, Defendant Correia had the power to direct Plaintiff's work, assign Plaintiff tasks, discipline Plaintiff, fire Plaintiff, and set Plaintiff's work schedule." (*Id.* ¶ 34). Plaintiff further alleged that Mr. Correia "identified himself as Scratch Kitchen's 'Food Service Manager.' Defendant Correia frequently made trips to stores to pick up supplies and food needed in the restaurant. Often, Plaintiff would notify Defendant Rousseau that some supplies or ingredients were needed, and Ms. Rousseau would direct Plaintiff to tell Defendant Correia." (*Id.* ¶ 35). Additionally, "Defendant Correia was present within Scratch Kitchen nearly every single day that Plaintiff worked and typically and customarily remained in the restaurant for the entirety of each workday." (*Id.* ¶ 36). Lastly, Plaintiff alleged that Mr. Correia is titled

4

"Scratch Kitchen & Bistro's business partner" in a news article. (*Id.* ¶ 37). Neither of the individual Defendants filed a response to the amended complaint.

On September 12, 2024, Plaintiff filed a motion for clerk's entry of default (ECF No. 51), and on October 7, 2024, the clerk entered default as to Ms. Rousseau and Mr. Correia. (ECF Nos. 53, 54). On December 6, 2024, Plaintiff filed a motion for default judgment as to all Defendants. (ECF No. 58). Defendants did not file a response; however, on January 24, 2025, Ms. Rousseau filed a motion to vacate the clerk's entry of default. (ECF No. 59). On February 7, 2025, Plaintiff filed a response in opposition to Ms. Rousseau's motion to vacate the clerk's entry of default. (ECF No. 60). Ms. Rousseau did not respond. On June 17, 2025, the court denied Ms. Rousseau's motion to vacate the clerk's entry of default, and the court directed Defendants to file any further opposition to Plaintiff's motion for default judgment by July 8, 2025. (ECF Nos. 65; 66). On July 9, 2025, the memorandum opinion mailed to Mr. Correia was returned as undeliverable. (ECF No. 67). Defendants have not filed any further opposition, and the time to do so has passed.

## II.  Standard of Review

Entry of default and motions for default judgment are governed by Fed.R.Civ.P. 55. Under the two-step procedure, the non-

defaulting party first moves for entry of default under Rule 55(a).
If appropriate, the clerk is directed to enter the default, and a
notice is sent to the defaulting party.  Then, the non-defaulting
party may move for entry of default judgment under Rule 55(b).
"If the plaintiff's claim is for a sum certain or a sum that can
be made certain by computation," the judgment may be entered by
the clerk.  Fed.R.Civ.P. 55(b)(1).  Otherwise, "the party must
apply to the court for a default judgment." Fed.R.Civ.P. 55(b)(2).
The process is as follows:

> "Upon entry of default, the well-pled
> allegations in a complaint as to liability are
> taken as true, but the allegations as to
> damages are not." *Trs. of Nat'l Elec. Benefit
> Fund v. Eckardt Elec. Co.*, No. 23-cv-1459-DKC,
> 2024 WL 473805, at *2 (D.Md. Feb. 7, 2024);
> *see also S.E.C. v. Lawbaugh*, 359 F.Supp.2d
> 418, 422 (D.Md. 2005). Conclusions of law are
> also not deemed admitted, and therefore "[t]he
> court must . . . determine whether the well-
> pleaded allegations in [the] complaint support
> the relief sought[.]" *Ryan v. Homecomings Fin.
> Network*, 253 F.3d 778, 780 (4th Cir. 2001).
>   Before entering default judgment, "[t]he
> court first determines whether the
> unchallenged factual allegations constitute a
> legitimate cause of action, and, if liability
> is established, the court then makes an
> independent determination of damages." *Trs. of
> Nat'l Elec. Benefit Fund*, 2024 WL 473805, at
> *2 (citing Fed.R.Civ.P. 55(a)); *see also J&J
> Sports Prods., Inc. v. Torres*, No. 18-cv-1001-
> GJH, 2019 WL 1384090, at *2 (D.Md. Mar. 27,
> 2019) (citing *Agora Fin., LLC v. Samler*, 725
> F.Supp.2d 491, 494 (D.Md. 2010)).
>   "While the court may hold a hearing to
> prove damages, it is not required to do so; it
> may rely instead on 'detailed affidavits or

6

> documentary evidence to determine the
> appropriate sum.'" *Trs. of Nat'l Elec. Benefit
> Fund*, 2024 WL 473805, at *2 (quoting *Adkins v.
> Teseo*, 180 F.Supp.2d 15, 17 (D.D.C. 2001));
> *see also Laborers' Dist. Council Pension v.
> E.G.S., Inc.*, Civ. No. 09-cv-3174-WDQ, 2010 WL
> 1568595, at *3 (D.Md. Apr. 16, 2010) ("[O]n
> default judgment, the Court may only award
> damages without a hearing if the record
> supports the damages requested.").

*Timilon Corp. v. Empowerment Just. Ctr. Corp.*, 738 F.Supp.3d 669,
678–79 (D.Md. 2024).

## III. Analysis

Plaintiff requests a judgment against Defendants, jointly and
severally, for (1) $5,080.00 in unpaid wages under the MWHL and
MWPCL, (2) liquidated damages of $15,240.00[1] under the MWPCL, or
liquidated damages of $5,080.00 under the MWHL, (3) $10,000.00 in
mental and emotional distress damages under the FLSA anti-
retaliation provision, and (4) attorneys' fees and costs of
$32,443.25. (ECF No. 58, at 24).

### A. Liability

"In determining whether entry of default judgment is proper,
the court must first determine whether [Plaintiff] has alleged a
legitimate cause of action and whether the well pleaded allegations

---

[1] In the body of Plaintiff's motion, Plaintiff asks for treble
damages under the MPWCL, for a total of $15,240.00. (ECF No. 58,
at 11). In Plaintiff's conclusion, however, Plaintiff asks for
$10,160.00 in liquidated damages under the MWPCL. (*Id.* at 24).

7

support a finding of liability." *Timilon Corp.*, 738 F.Supp.3d at 684 (citing *Trs. of Nat'l Elec. Benefit Fund*, 2024 WL 473805, at *2)).

### 1. Unpaid Wages Under the MWHL and MWPCL (Counts III and IV)[2]

Plaintiff alleged that Defendants owe her overtime wages under the MWHL and the MWPCL.

### a. Employment Status

As the court stated:

> Under the FLSA and MWHL, only employees, and not independent contractors, are authorized to seek recovery for unpaid wages. *See Schultz v. Cap. Int'l Sec., Inc.*, 466 F.3d 298, 305 (4th Cir. 2006) (distinguishing between FLSA-covered employees and independent contractors); *Heath v. Perdue Farms, Inc.*, 87 F.Supp.2d 452, 456 (D.Md. 2000) (stating that the defendant is only liable for overtime violations under the FLSA or MWHL if there is an employment relationship between the defendant and plaintiffs). "[T]o determine whether a worker is an employee under the FLSA, courts look to the '"economic realities" of the relationship between the worker and the putative employer.'" *McFeeley v. Jackson St. Ent., LLC*, 825 F.3d 235, 241 (4th Cir. 2016) (quoting *Schultz*, 466 F.3d at 304). "The touchstone of the 'economic realities' test is whether the worker is 'economically dependent on the business to which he renders service or is, as a matter of economic [reality], in business for himself.'" *Id.* (quoting *Schultz*,

---

[2] Plaintiff does not seek default judgment under Count I of her amended complaint for unpaid wages under the FLSA against Scratch Kitchen. (ECF No. 58, at 8 n.6). Additionally, Plaintiff no longer seeks the $500.00 in unpaid wages under the MWPCL. (ECF No. 60, at 2). Those abandoned claims will be dismissed.

466 F.3d at 304). "Where the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the [FLSA]." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947). Courts apply the same FLSA economic realities test to analyze employee status under the MWHL. *See, e.g., Harbourt v. PPE Casino Resorts Maryland, LLC*, 820 F.3d 655, 661 (4th Cir. 2016) ("[A]nalysis of the existence of an employment relationship is the same under the MWHL . . . as under the FLSA[.]" (citing *Campusano v. Lusitano Const. LLC*, 208 Md.App. 29, 36–38 (2012))); *Randolph v. PowerComm Const., Inc.*, 7 F.Supp.3d 561, 569–72 (D.Md. 2014) (applying the economic realities test to determine whether the plaintiff was an employee or independent contractor under both the FLSA and MWHL); *Heath v. Perdue Farms, Inc.*, 87 F.Supp.2d 452, 458–59 (D.Md. 2000) (same).

(ECF No. 42, at 7-9). The court then analyzed Plaintiff's status using the six factor economic realities test,[3] and the court

---

[3] The six factors are as follows:

> (1) [T]he degree of control that the putative employer has over the manner in which the work is performed;
> (2) the worker's opportunities for profit or loss dependent on his managerial skill;
> (3) the worker's investment in equipment or material, or his employment of other workers;
> (4) the degree of skill required for the work;
> (5) the permanence of the working relationship; and
> (6) the degree to which the services rendered are an integral part of the putative employer's business.

(ECF No. 42, at 9 (quoting *McFeeley*, 825 F.3d at 241)). The court also noted that "[t]he 'economic reality' test to determine whether

9

determined that Plaintiff "alleged [sufficient] facts showing that she is Scratch Kitchen's and Ms. Rousseau's employee" under the FLSA and MWHL. (ECF No. 42, at 7, 15).

The court also found that Plaintiff failed to allege sufficient facts that Mr. Correia was an employer under the FLSA or the MWHL. (*Id.* at 21). In her amended complaint, Plaintiff added allegations, including that "[t]hroughout Plaintiff's employment, Defendant Correia was the individual with the primary responsibility for supervising Plaintiff. In this role, Defendant Correia had the power to direct Plaintiff's work, assign Plaintiff tasks, discipline Plaintiff, fire Plaintiff, and set Plaintiff's work schedule." (*Id.* ¶ 34). Plaintiff further alleged that "Defendant Correia identified himself as Scratch Kitchen's 'Food Service Manager.' Defendant Correia frequently made trips to stores to pick up supplies and food needed in the restaurant. Often, Plaintiff would notify Defendant Rousseau that some supplies or ingredients were needed, and Ms. Rousseau would direct Plaintiff to tell Defendant Correia." (*Id.* ¶ 35). Additionally, "Defendant Correia was present within Scratch Kitchen nearly every single day that Plaintiff worked and typically and customarily

---

an individual is an *employer* under the FLSA, analyzes different factors than the 'economic reality' test to determine whether an individual is an *employee*." (ECF No. 42, at n.3 (quoting *McFeeley v. Jackson St. Ent., LLC*, 47 F.Supp.3d 260, 274 (D.Md. 2014)).

remained in the restaurant for the entirety of each workday." (*Id.* ¶ 36). Lastly, Plaintiff alleged that Mr. Correia is titled "Scratch Kitchen & Bistro's business partner" in a news article. (*Id.* ¶ 37). As the court stated in its earlier opinion:

> The economic realities test to determine employer status consists of four factors, none of which are dispositive: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 83 (4th Cir. 2016) (quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999)); *see also Campusano v. Lusitano Const. LLC*, 208 Md.App. 29, 39-40 (2012) (quoting *Newell v. Runnels*, 407 Md. 578, 651 (2009)).

(ECF No. 42, at 20).

Although Plaintiff has added allegations as to Mr. Correia, the allegations are still not enough to show that he was an employer under the economic realities test. As in the original complaint, Plaintiff's conclusory assertions that Mr. Correia was "the individual with the primary responsibility for supervising Plaintiff" and therefore "had the power to direct Plaintiff's work, assign Plaintiff tasks, discipline Plaintiff, fire Plaintiff, and set Plaintiff's work schedule" without additional facts is not enough to allege that Mr. Correia was an employer under the FLSA or MWHL. (ECF Nos. 42, at 20-21; 47 ¶ 34). Plaintiff's other new

allegations show that Mr. Correia was merely involved in Scratch Kitchen. Plaintiff's allegations that Mr. Correia called himself the restaurant's "Food Service Manager," "made trips to stores to pick up supplies and food needed in the restaurant," and was present at the restaurant every workday only show that he worked at the restaurant, and do not show that he was an employer. (ECF No. 47 ¶¶ 35-36). Plaintiff's allegation that she "would notify Defendant Rousseau that some supplies or ingredients were needed, and Ms. Rousseau would direct Plaintiff to tell Defendant Correia" similarly shows that Plaintiff and Mr. Correia merely worked together at Scratch Kitchen. (*Id.* ¶ 35).

Further, being identified as "Scratch Kitchen & Bistro's business partner" in a news article does not either show whether Mr. Correia had the power to hire and fire employees or whether he supervised or controlled the work conditions in any way. (*Id.* ¶ 37). Lastly, Plaintiff does not make any allegations regarding the last two economic realities factors: whether Mr. Correia "determined the rate and method" of her payment or "maintained employment records." (ECF No. 42, at 20 (quoting *Kerr*, 824 F.3d at 83)). Accordingly, Plaintiff has still not alleged that Mr. Correia was an employer under the FLSA or MWHL, and default judgment will not be entered against him.

**b.  Overtime Wages**

Plaintiff alleged that she worked for Defendants from around August 2022 to August 2, 2023, and she "regularly and customarily worked more than fifty" hours per week. (ECF No. 47 ¶¶ 18, 25). Plaintiff further alleged that Defendants paid her between $19.00 to $20.00 an hour, "regardless of whether Plaintiff worked hours over forty each week." (*Id.* ¶¶ 26-27). Additionally, Defendants paid Plaintiff through Zelle in part "to obscure the number of hours Plaintiff worked." (*Id.* ¶ 29). Defendants also told Plaintiff "that because they classified her as a contractor, she was not legally entitled to overtime wages." (*Id.* ¶ 31). Plaintiff also alleged that Defendants knew that she was working over forty hours per week. (*Id.* ¶¶ 76, 78). Nevertheless, Defendants refused to pay her overtime wages of time and a half for the time she worked over forty hours each week. (*Id.* ¶ 75).

"Section 3-415 of the MWHL requires employers to pay their employees an overtime wage of at least one-and-half times their usual hourly wage for work they perform in excess of forty hours per week." *Calderon Recinos v. JMZ Constr., LLC*, No. 15-CV-0406-DKC, 2016 WL 3162820, at *2 (D.Md. June 7, 2016) (citing Md. Code Ann., Lab. & Empl. §§ 3-415, 3-420). Additionally, the MWHL works together with the MWPCL. *Id.*

> Maryland has two wage enforcement laws . . . the [M]WHL and the [M]WPCL. The

13

> [M]WHL aims to protect Maryland workers by
> providing a minimum wage standard. The [M]WPCL
> requires an employer to pay its employees
> regularly while employed, and in full at the
> termination of employment. Read together,
> these statutes allow employees to recover
> unlawfully withheld wages from their employer,
> and provide an employee two avenues to do so.

*Calderon Recinos*, 2016 WL 3162820, at *3 (quoting *Peters v. Early Healthcare Giver, Inc.*, 439 Md. 646, 646 (2014)).

Plaintiff alleges that she "regularly and customarily worked more than fifty" hours per week for around one year. (ECF No. 47 ¶¶ 18, 25). She alleges that she was not paid time and a half for any of the hours she worked after forty hours. Accepting Plaintiff's allegations as true, Plaintiff has established that Scratch Kitchen and Ms. Rousseau are liable under the MWHL and the MWPCL.

### 2.    FLSA Retaliation (Count II)

Plaintiff alleged that her last day of employment was on or around August 2, 2023. (ECF No. 47 ¶ 40). On August 10, 2023, Plaintiff sent a text message to Ms. Rousseau requesting payment of her unpaid wages. (*Id.* ¶ 41). Plaintiff alleged that requesting her unpaid wages was a protected activity under the FLSA. (*Id.* ¶¶ 41, 68). Plaintiff alleged that Defendants retaliated against her by responding with multiple texts with expletives threatening to report Plaintiff to immigration authorities and also filing a meritless "Interim Peace Order seeking to restrain Plaintiff and

14

her counsel from contacting Defendants regarding her unpaid wages." (*Id.* ¶¶ 41-46, 50-56, 70-71).

Under the FLSA, it is unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter . . . ." 29 U.S.C. § 215(a)(3).

As discussed above, Plaintiff has alleged sufficiently an employer/employee relationship under the FLSA between herself and Scratch Kitchen and Ms. Rousseau, but not between herself and Mr. Correia.

Additionally, while the overtime provision of the FLSA has an enterprise requirement, as discussed in detail in the court's previous memorandum opinion, "[t]he enterprise requirements do not . . . apply to the anti-retaliation provision of the FLSA, which is in another section of the statute." (ECF No. 65, at 10-13) (collecting cases).

Therefore, although Plaintiff has not alleged properly that Defendants are an enterprise under the FLSA, as the court concluded previously, "Scratch Kitchen, and, more importantly, Ms. Rousseau, do not need to be an enterprise in order for Plaintiff to bring a claim for FLSA retaliation." (ECF No. 65, at 10-13).

To state a claim for retaliation under the FLSA, a plaintiff must allege that: "1) plaintiff engaged in an activity protected by the FLSA; 2) plaintiff suffered adverse action by the employer subsequent to or contemporaneous with such protected activity; and 3) causal connection exists between the employee's activity and the employer's adverse action." *Braxton v. Jackson*, No. 18-CV-1946-DKC, 2019 WL 4573381, at *4 (D.Md. Sept. 20, 2019) (citing *Darveau v. Detecon, Inc.*, 515 F.3d 334, 340 (4th Cir. 2008)). "Actions taken by an employer after an employee's termination – or an employee's voluntary departure – can qualify as 'adverse actions' under FLSA." *Id.* (citing *Darveau*, 515 F.3d at 343-44).

### a.    Protected Activity

Moreover, "intracompany complaints"—that is, complaints made by an employee to an employer—"may constitute 'fil[ing] any complaint' under § 215(a)(3)." *Minor* [*v. Bostwick Lab'ys, Inc.*], 669 F.3d [428,] [] 439 [(4th Cir. 2012)](quoting 29 U.S.C. § 215(a)(3)) (alteration in *Minor*).

However, not "every instance of an employee 'letting off steam' to his employer constitutes protected activity." *Minor*, 669 F.3d at 439 (quoting *Kasten* [*v. Saint-Gobain Performance Plastics Corp.*], 563 U.S. [1,] [] 14 [(2011)]). "To the contrary, 'the statute requires fair notice' to employers." *Minor*, 669 F.3d at 439 (quoting *Kasten*, 563 U.S. at 14). "To protect employers from unnecessary uncertainty, 'some degree of formality' is required for an employee complaint to constitute protected activity, 'certainly to the point where the recipient has been given fair notice that a grievance has been lodged and does, or should, reasonably understand

16

that matter as part of its business concerns.'" *Minor*, 669 F.3d at 439 (quoting *Kasten*, 563 U.S. at 14).

*Yearick v. Kimball Constr. Co.*, No. 23-CV-2540-ELH, 2023 WL 8829243, at *5 (D.Md. Dec. 21, 2023).

Plaintiff has alleged that she engaged in an activity protected by the FLSA by demanding payment through text message on August 10, 2023, and by sending a demand letter through counsel for her unpaid wages. (ECF No. 47 ¶¶ 40-48; 65-68). This is sufficient to allege that she filed an "intracompany complaint" that gave Defendants "fair notice" of Plaintiff's grievances.

### b. Adverse Action

To allege an adverse action under the FLSA, a plaintiff must allege that the action "'would have been materially adverse to a reasonable employee' because the 'employer's actions . . . could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Darveau*, 515 F.3d at 343 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). "An employer's filing of a lawsuit 'with a retaliatory motive and without a reasonable basis in fact or law,' likewise may qualify as an 'adverse action' under FLSA." *Braxton*, 2019 WL 4573381, at *4 (quoting *Darveau*, 515 F.3d at 343-44).

Plaintiff's allegations that Defendants threatened to report Plaintiff to immigration authorities and filed a meritless

"Interim Peace Order seeking to restrain Plaintiff and her counsel from contacting Defendants regarding her unpaid wages" allege sufficiently that Defendants' actions were "materially adverse to a reasonable employee" because these actions could dissuade an employee from making a complaint under the FLSA. (ECF No. 47 ¶¶ 41-46, 50-56, 70-71).

### c.    Causal Connection

Plaintiff alleged that Ms. Rousseau sent the threatening text messages in response to her request for her unpaid wages. (*Id.* ¶¶ 41-46, 70). Additionally, Plaintiff alleges that the interim peace order specifies that Plaintiff was "demanding money" and Plaintiff's attorney "keeps demanding" Plaintiff's payment. (*Id.* ¶ 51). At this stage, Plaintiff has alleged a causal connection between her texts and demand letter and Ms. Rousseau's threats and the interim peace order. Accordingly, Plaintiff has stated an FLSA retaliation claim against Ms. Rousseau and Scratch Kitchen.

### B.    Damages

Although the facts in Plaintiff's amended complaint are taken as true, Plaintiff must prove her damages. *Timilon Corp.*, 738 F.Supp.3d at 678-79 (citing *Trs. of Nat'l Elec. Benefit Fund*, 2024 WL 473805, at *2). In her motion for default judgment, Plaintiff requests (1) $5,080.00 in unpaid wages under the MWHL and MWPCL,

(2) liquidated damages of $15,240.00[4] under the MWPCL or liquidated damages of $5,080.00 under the MWHL, (3) $10,000.00 in mental and emotional distress damages under the FLSA anti-retaliation provision, and (4) attorneys' fees and costs of $32,443.25. (ECF No. 58, at 11, 24).

**1.   MWHL/MWPCL**

**a.   Overtime Wages**

Plaintiff asserts that she is entitled to $5,080.00 in unpaid overtime wages under the MWHL. (ECF No. 58, at 8).

> The amount defendants owe to plaintiffs is calculated based on plaintiffs' rate of compensation and the number of unpaid hours each worked. "In cases such as the present one in which wage and pay records, required to be kept by employers pursuant to 29 U.S.C. § 211(c),[5] are not available, [the employees] must show the amount and extent of their improperly compensated work 'as a matter of just and reasonable inference.'" *Lopez* [*v. Lawns 'R' Us*], DKC-07-2979, 2008 WL 2227353, at *3 [(D.Md. May 23, 2008)], [*report and recommendation adopted sub nom. Lopez v. Lawns "R" Us*, No. CV DKC 2007-2979, 2008 WL 11509751 (D.Md. June 26, 2008)] (quoting *Donovan v. Bel-Loc Diner, Inc.*, 780 F.2d 1113, 1116 (4th Cir. 1985)); *see Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946) ("Due regard must be given to the fact that it is the employer who

---

[4] As stated above, in the body of Plaintiff's motion, Plaintiff asks for treble damages under the MPWCL, for a total of $15,240.00. (ECF No. 58, at 11). In Plaintiff's conclusion, however, Plaintiff asks for $10,160.00 in liquidated damages under the MWPCL. (*Id.* at 24).

[5] Under the MWHL, an employer is also required to keep wage and payment records. Md. Code Ann., Lab. & Empl. § 3-424.

has the duty under . . . the Act to keep proper records of wages, hours and other conditions and practices of employment and who is in position to know and to produce the most probative facts concerning the nature and amount of work performed. Employees seldom keep such records themselves; even if they do, the records may be and frequently are untrustworthy. It is in this setting that a proper and fair standard must be erected for the employee to meet in carrying out his burden of proof."), *superseded by statute on other grounds, as stated*, *inter alia*, in *Integrity Staffing Solutions, Inc.* [*v. Busk*], 574 U.S. [27] at 36, 135 S.Ct. 513 [(2014)].

An employee's statement under oath "as to his recollection of the hours he worked and the pay he received, if considered credible by the trier of fact, is sufficient to establish a prima facie case of wages owed." *Lopez*, 2008 WL 2227353, at *3. And, if the employer does not successfully rebut the employee's statement, "[t]he Court may award damages based on Plaintiffs' testimony even though the amounts claimed are only approximated and not perfectly accurate." *Id.*[]

*Gaither v. Davi Transp. Servs., LLC*, No. 18-CV-1447-ELH, 2020 WL 2614783, at *7 (D.Md. May 22, 2020). "The requirements of the MWHL 'mirror' those of the FLSA and claims under both statutes therefore stand or fall together." *Aleman v. Marroquin*, No. 23-CV-2475-GLR, 2025 WL 2050959, at *2 (D.Md. July 22, 2025) (quoting *Orellana v. Cienna Props., LLC*, 11-CV-2515-JKB, 2012 WL 203421, at *5 (D.Md. Jan. 23, 2012)).

Plaintiff avers that she worked for Defendants from August 2022 to August 2, 2023. (ECF No. 58-1, at 1). Her duties included

"cooking, food preparation, taking orders, cleaning floors and tables, and delivering food, among other tasks." (*Id.*). Plaintiff asserts that Defendants paid her $19.00 an hour for the first month, and although she does not remember the precise date, after approximately one month, Defendants paid Plaintiff $20.00 an hour. (*Id.* at 1, 3; ECF No. 58, at 11). She further avers that although her schedule varied, she regularly worked more than fifty hours each week. (ECF No. 58-1, at 3). Defendants however, never paid her overtime pay of one and a half times her regular rate. (*Id.* at 1).

Plaintiff provided a spreadsheet calculating the damages. (ECF No. 58-10). She states that "[f]or the purposes of estimating damages, Plaintiff has conservatively assumed that she worked fifty (50) hours per week." (ECF No. 58, at 11). Plaintiff lists the weeks she worked, the rate of payment, the hours she worked, the overtime premium, and how much overtime payment she was owed each week. (ECF No. 58-10, at 1-2). Plaintiff avers that the total overtime payment owed is $5,080.00. (*Id.* at 2). Plaintiff has shown sufficiently the wages she is owed, and Defendants have not rebutted Plaintiff's statement successfully.[6]  Therefore, the

_____

[6] In her motion to vacate clerk's entry of default, Ms. Rousseau argued that Plaintiff initially was paid $12.20 an hour "on an as needed basis." (ECF No. 59, at 2). Ms. Rousseau asserted that on October 19, 2023, she offered Plaintiff $19.00 an hour to work as a chef as needed. (ECF No. 59, at 2). The court noted in

court will award Plaintiff $5,080.00 in overtime wages under the MWHL.

   **b.  Liquidated Damages**

   Plaintiff also requests liquidated damages under the MWPCL or the MWHL, but the amount she requests is unclear.  In the body of Plaintiff's motion, Plaintiff requests treble damages under the MPWCL, for a total of $15,240.00.  (ECF No. 58, at 11).  In the conclusion, however, Plaintiff asks for $10,160.00 in liquidated damages under the MWPCL.  (*Id.* at 24).  In the alternative, Plaintiff requests liquidated damages of $5,080 under the MWHL. (*Id.* at 13-14, 24).

   Both the MWPCL and the MWHL allow for enhanced damages. "Enhanced damages serve the dual purposes of compensating employees for consequential losses, such as late charges or evictions that can occur when employees who are not properly paid are unable to meet their financial obligations; and of penalizing

---

its previous opinion that "[t]his date is likely erroneous as Plaintiff ceased working for Defendants in August 2023, and the original complaint was filed in September 2023." (ECF No. 65, at n.4).  Plaintiff argued that even if she initially was paid $12.20 an hour, she would still have a claim for overtime wages because Ms. Rousseau only disputes the rate of payment, not that Plaintiff worked overtime.  (*Id.* at 14).  Additionally, Plaintiff argued that if Ms. Rousseau's assertions are true, Plaintiff would also have an additional claim for unpaid minimum wages, because the minimum wage for small employers in Maryland in 2023 was $12.80 an hour. (*Id.* at 14-15).  Lastly, the court gave Defendants an opportunity to file any further opposition to Plaintiff's motion for default judgment, and they did not do so.  (ECF No. 66).

employers who withhold wages without colorable justification." *Calderon Recinos*, 2016 WL 3162820, at *4 (quoting *Clancy v. Skyline Grill, LLC*, No. 12-CV-1598-ELH, 20122 WL 5409733, at *8 (D.Md. Nov. 5, 2012)).

> The MWHL allows for liquidated damages amounting to double damages, while the MWPCL allows for treble damages when "a court finds that an employer withheld the wage of an employee in violation of this subtitle and not as the result of a bona fide dispute." *Butler* [*v. PP&G, Inc.*], [No. CV 20-3084-JRR,] 2023 WL 3580374, at *9 [(D.Md. May 22, 2023), *report and recommendation adopted as modified*, No. 1:20-CV-03084-JRR, 2023 WL 12090213 (D.Md. June 25, 2023)] (quoting Md. Code Ann., Lab. & Empl. § 3-507.2(b)). In this District, it has become "customary" to award double damages under the MWHL rather than treble damages under the MWPCL when (1) the defendant offers no evidence of a bona fide dispute that would make liquidated damages inappropriate, but (2) the plaintiff offers no evidence of consequential damages suffered because of the underpayments. *Fiallos v. Hamzah Slaughter House, LLC*, No. 20-cv-03577-JMC, 2022 WL 16540001, at *7 (D.Md. Oct. 28, 2022) (citing *Clancy v. Skyline Grill, LLC*, No. ELH-12-1598, 2012 WL 5409733, at *8 (D.Md. Nov. 5, 2012)). *See also Butler*, 2023 WL 3580374, at *9.

*Morris v. King Oak Enters., Inc.*, No. 8:24-CV-00782-AAQ, 2024 WL 4476303, at *9 (D.Md. Oct. 11, 2024).

Defendants have not shown that Plaintiff's overtime wages were withheld because of a bona fide dispute.[7]  Therefore, enhanced

---

[7] As discussed above, Ms. Rousseau does dispute Plaintiff's initial rate of pay. (ECF No. 59, at 2).  She does not, however, dispute that Plaintiff worked overtime without receiving overtime

damages are appropriate.   Plaintiff, however, has not shown evidence or even argued that she suffered consequential damages because of the underpayments.   Therefore, under the "customary" approach of this district, treble damages under the MWPCL are not appropriate.   *See Morris*, 2024 WL 4476303, at *9 (collecting cases).   Instead, Plaintiff will be awarded liquidated damages under the MWHL for an additional $5,080, as per her alternative request.   (ECF No. 58, at 13-14, 24), Md. Code. Ann., Lab. & Empl. § 3-427(d)(1)(ii).

### 2.   FLSA

Plaintiff requests $10,000 in mental and emotional distress damages under the FLSA.   (ECF No. 58, at 22-23).   In her amended complaint, Plaintiff alleged that because of Ms. Rousseau's peace order, Plaintiff "suffered, and continues to suffer, mental and emotional distress damages."   (ECF No. 47 ¶ 57).   In her motion for default judgment, Plaintiff avers that she "suffered from stress, anxiety, and fear of additional retaliation since Defendants' unlawful retaliatory actions."   (ECF No. 58, at 22).   She states that she "returned her car to the dealership out of fear that Defendant Rousseau would find and follow her," and she "move[ed] to a new house to avoid being found by either Defendant

---

wages.   Additionally, the court gave Defendants an opportunity to file any further opposition to Plaintiff's motion for default judgment, and they did not do so.   (ECF No. 66).

Rousseau or the U.S. immigration authorities." (ECF Nos. 58, at 22; 58-1, at 4). Plaintiff also declares that "[b]ecause of the anxiety caused by Defendant Rousseau's threats, Plaintiff was unable to work from the end of her employment with Defendants until August 2024." (ECF Nos. 58, at 22; 58-1, at 4). Plaintiff has had "difficulty sleeping" and "frequent nightmares of being found by Defendant Rousseau or U.S. immigration authorities." (ECF Nos. 58, at 22; 58-1, at 4). Finally, "Plaintiff was forced to send her one-year-old daughter to live with Plaintiff's mother in El Salvador ou[t] of fear for what could happen if Plaintiff was discovered by Defendant Rousseau or the U.S. immigration authorities." (ECF Nos. 58, at 22-23; 58-1, at 4).

Although the FLSA damages provision does not provide explicitly for emotional damages, this court has found previously that, based on the holdings of other circuit courts of appeal and "[b]ecause 'full compensation is the evident purpose and paramount policy' in an FLSA retaliation action, 'the more reasoned approach' would permit a plaintiff who makes a proper showing to recover damages for emotional distress." *Randolph v. ADT Sec. Servs., Inc.*, No. 09-CV-1790-DKC, 2012 WL 2234362, at *7 (D.Md. June 14, 2012) (first quoting *Bogacki v. Buccaneers Ltd. P'ship,* 370 F.Supp.2d 1201, 1205 (M.D.Fla. 2005), and then quoting *Moore v. Freeman,* 355 F.3d 558, 563-64 (6th Cir. 2004)).

Additionally, in a more recent case that proceeded to trial, this court allowed a claim for emotional distress on a plaintiff's retaliation claim, although the court found ultimately that the plaintiff did not produce sufficient evidence to support his claim. *Johnson v. Helion Techs., Inc.*, No. 18-CV-3276-DKC, 2022 WL 911203, at *1 (D.Md. Mar. 29, 2022).   Further, a district court in the Eastern District of Virginia analyzed whether a plaintiff could recover emotional distress damages for an FLSA retaliation claim, and the court found that while the United States Court of Appeals for the Fourth Circuit had not ruled on the issue, based on the reasoning of other circuit courts and "the expansive language in the FLSA's remedies provision applicable to retaliation claims and the remedial purpose of the FLSA," a plaintiff could recover emotional damages related to FLSA retaliation.   *Aguirre v. Joe Theismann's Rest.*, No. 119CV556, 2019 WL 12267459, at *6–7 (E.D.Va. July 23, 2019).   Accordingly, Plaintiff can request emotional distress damages under the FLSA, and the court must determine whether Plaintiff has provided sufficient evidence to support her claim.

In the Privacy Act, 5 U.S.C. § 552a(g)(4) and the 42 U.S.C. § 1983 context, the Fourth Circuit has found that:

> An award of compensatory emotional distress damages requires evidence "establish[ing] that the plaintiff suffered demonstrable emotional distress, which must be sufficiently

articulated; neither conclusory statements
that the plaintiff suffered emotional distress
nor the mere fact that a . . . violation
occurred supports an award of compensatory
damages."[] *Price v. City of Charlotte*, 93 F.3d
1241, 1254 (4th Cir. 1996). A plaintiff's own
conclusory allegations that he felt
"embarrassed," "degraded," or "devastated,"
and suffered a loss of self-esteem, will not
suffice to create a disputed issue of material
fact for the jury regarding the presence of
compensable emotional distress. *Id.* at 1255;
*see also Brady v. Fort Bend County*, 145 F.3d
691, 718–19 (5th Cir. 1998) (in a § 1983
action, "vague and conclusory" testimony that
a claimant was "highly upset," could not
"accept it mentally," "didn't feel like the
same person," or "spent more time on the
couch" does not satisfy the specificity
standard for compensable emotional distress).
Where, on the other hand, a plaintiff can
produce evidence that emotional distress
caused chest pains and heart palpitations,
leading to medical and psychological treatment
which included a formal diagnosis of "major
depressive disorder," as well as necessitated
prescription medication, it is clear that some
amount of compensatory damages for emotional
distress is warranted. *Knussman v. Maryland*,
272 F.3d 625, 640 (4th Cir. 2001).

In determining whether sufficient
evidence exists to support an award of more
than nominal damages for emotional distress,
we examine factors such as the need for
medical, psychological, or psychiatric
treatment, the presence of physical symptoms,
loss of income, and impact on the plaintiff's
conduct and lifestyle. *Price*, 93 F.3d at 1255.
In Price, we held that failure to establish
emotional distress with sufficient evidence
will result in the award of only nominal
damages.[] *Id.* Nominal damages, when
available, are designed to vindicate legal
rights "without proof of actual injury." *Carey
v. Piphus*, 435 U.S. 247, 266, 98 S.Ct. 1042,
55 L.Ed.2d 252 (1978). An award of merely

27

> nominal damages means that a plaintiff has not
> shown "actual injury."

*Doe v. Chao*, 306 F.3d 170, 180-81 (4th Cir. 2002), *aff'd,* 540 U.S. 614 (2004).  Additionally, in affirming an award for compensatory damages for emotional distress in a race discrimination and retaliation case, the Fourth Circuit wrote that:

> [A] plaintiff's testimony, standing alone, can
> support an award of compensatory damages for
> emotional distress. *Price v. City of
> Charlotte,* 93 F.3d 1241, 1251 (4th Cir. 1996).
> Such testimony must "establish that the
> plaintiff suffered demonstrable emotional
> distress, which must be sufficiently
> articulated." *Id.* at 1254. The testimony
> cannot rely on "conclusory statements that the
> plaintiff suffered emotional distress" or the
> mere fact that the plaintiff was wronged. *Id.*
> Rather, it must indicate with specificity "how
> [the plaintiff's] alleged distress manifested
> itself." *Id.* The plaintiff must also "show a
> causal connection between the violation and
> her emotional distress." [*Dennis v.*] *Columbia
> Colleton Med. Ctr.* [*Inc.*], 290 F.3d [639,] []
> 653 [(4th Cir. 2002)].

*Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 546-47 (4th Cir. 2003).

Although Plaintiff has not provided evidence that she had a need for medical or psychological treatment, she has presented evidence that Defendants' actions have caused her to suffer "demonstrable emotional distress."  Plaintiff stated in her declaration that because of her fear of Ms. Rousseau's threats, she had difficulty sleeping, and she also provided evidence as to

the impact of her distress on her conduct and lifestyle by stating that she gave up her car, moved to a new home, was unable to work, and sent her one-year-old daughter to live with her mother in El Salvador. (ECF No. 58-1, at 4). Therefore, Plaintiff has shown with specificity how her distress "manifested," and the "causal connection" between the threats and her distress.

The next question is what amount of money should be awarded to compensate for the emotional distress. Plaintiff has not provided any explanation as to why $10,000 is an appropriate number of emotional distress damages. In reviewing jury awards, a court compares "the jury's damages assessment to awards in comparable cases," to determine whether the evidence supports the amount awarded. *Jones v. Southpeak Interactive Corp. of Del.*, 777 F.3d 658, 673 (4th Cir. 2015). As noted above, cases involving emotional distress damages for FLSA retaliation claims are not numerous. Thus, the court must look to analogous situations for comparators. The Fourth Circuit, in 2007, described a $4,000 jury verdict returned in 1990 to be "a modest jury award based on little or no actual distress." *See Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 504 (4th Cir. 2007) (citing *Jones v. Credit Bureau of Huntington, Inc.*, 184 W.Va. 112, 399 S.E.2d 694, 695–701 (1990)). Similarly, in *Hetzel v. County of Prince William*, 89 F.3d 169, 172–73 (4th Cir. 1996), the court pointed approvingly to awards

under $25,000, except in more egregious cases of emotional distress. This case is more in line with *Parrish v. Leithman*, 733 F.Supp.3d 371, 376 (D.Md. 2024), in which Judge Bredar awarded $3,000 in a FDCPA case.

Accordingly, because Plaintiff does not provide any specific facts as to why $10,000 is an appropriate number, and in light of several cases from the Fourth Circuit and this district that favor lower awards absent more extreme circumstances, Plaintiff will be awarded $3,500 in mental and emotional distress damages.

### C.    Attorneys' Fees and Costs

Plaintiff requests $31,695.00 in attorneys' fees and $748.25 in costs, for a total of $32,443.25. (ECF No. 58, at 23-24). Under the MWHL, "[i]f a court determines that an employee is entitled to recovery in an action under this section, the court shall award to the employee . . . reasonable counsel fees and other costs." Md. Code Ann., Lab. & Empl. § 3-427(d)(1).

#### 1.    Attorneys' Fees

> The court determines the amount of a reasonable fee by starting with the "number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). This approach is commonly known as the "lodestar" method.[1] *Grissom v. The Mills Corp.*, 549 F.3d 313, 320 (4th Cir. 2008). In assessing reasonableness, the Fourth Circuit has instructed district courts to consider certain factors, including:

(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorney's fees awards in similar cases.

*Robinson v. Equifax Info. Servs.*, 560 F.3d 235, 243-244 (4th Cir. 2009) (quoting *Barber v. Kimbrell's Inc*, 577 F.2d 216, 226 n.28 (4th Cir. 1978)). "[T]he burden rests with the fee applicant to establish the reasonableness of a requested rate." *Id.* at 244 (quoting *Plyler v. Evatt*, 902 F.2d 273, 277 (4th Cir. 1990)). Plaintiff must provide documentation necessary to make a lodestar determination, including but not limited to: (1) declarations establishing the hours expended by counsel, broken down for each task; and (2) support for the reasonableness of counsel's hourly rate. *See Plyler*, 902 F.2d at 277 ("In addition to the attorney's own affidavits, the fee applicant must produce satisfactory specific evidence of the prevailing market rates in the relevant community for the type of work for which he seeks an award." (internal quotation marks omitted)).

*Calderon Recinos*, 2016 WL 3162820, at *4-5.

31

In analyzing the factors, the court "need not address in detail every single one of them" and can focus on the factors that are relevant to this particular case. *Johnson v. Helion Techs., Inc.*, No. 18-CV-3276-DKC, 2023 WL 2478860, at *7 (D.Md. Mar. 13, 2023) (citation modified). Additionally, the Local Rules provide that memoranda in support of motions for attorneys' fees must include, among other things, "a detailed description of the work performed broken down by hours or fractions thereof expended on each task." Local Rule 109(2)(b). An appendix to the Local Rules provides guidance on reasonable hourly rates, depending on years of experience. Local Rules, App'x B.[8]

In support of the requests for attorneys' fees, Plaintiff has provided detailed billing sheets and an affidavit from Anthony G. Bizien, lead counsel for Plaintiff. (ECF Nos. 58-11, 58-12). Mr. Bizien avers that he was admitted to the bar in 2017, and he is a

---

[8] Under the Local Rules guidance, the rates are as follows:
   a. Lawyers admitted to the bar for less than five (5) years: $150-225.
   b. Lawyers admitted to the bar for five (5) to eight (8) years: $165-300.
   c. Lawyers admitted to the bar for nine (9) to fourteen (14) years: $225-350.
   d. Lawyers admitted to the bar for fifteen (15) to nineteen (19) years: $275-425.
   e. Lawyers admitted to the bar for twenty (20) years or more: $300-475.
   f. Paralegals and law clerks: $95-150.

Local Rules, App'x B.3.

senior associate who has "successfully represented numerous clients in wage and hour cases similar to this one as lead and co-counsel in state and federal court." (ECF No. 58-11, at 2). His hourly rate is $400.00 an hour. (*Id.*). Mr. Bizien also avers that his colleague, Michael K. Amster, was admitted to the bar in 2009, is a named partner at the firm, and an accomplished employment law attorney. (*Id.* at 3). Mr. Amster's hourly rate is $450.00 an hour. (*Id.*).

These rates are higher than the rates listed in Local Rules Appendix B; nevertheless, Plaintiff asserts that the rates are reasonable given the years of experience of the attorneys and the prevailing market rates. (*Id.*). Additionally, although the request is not a model of clarity because it fails to provide the total hours expended on the case and the individual breakdown of the time each attorney spent, the overall time entries are well-documented and specific, and the total fee request is reasonable. Counsel have already reduced their fees voluntarily because counsel billed $60,740.00 litigating this case, and counsel only request $31,695.00 in attorneys' fees. (*Id.* at 22). $31,695.00 divided by Mr. Bizien's lower rate of $400.00 an hour is approximately 79 hours. Considering the length of the litigation, together with the other factors, Plaintiff's request for attorneys' fees is reasonable.

Additionally, other attorneys and staff are listed on the billing sheets, but Plaintiff does not request fees for most of the additional attorneys and staff. There are, however, multiple requests for reimbursement for work done by "Gabriela Alvarez," for a total of $765.00.[9] Because Plaintiff does not support the request for Ms. Alvarez's fees with information about her, those fee requests will be subtracted. Accordingly, $30,930.00 will be awarded in attorneys' fees.[10]

### 2. Costs

Plaintiff requests $748.25 in costs, for the filing fee ($402.00) and service of process on Defendants ($143.75, $58.75, and $143.75). (ECF No. 58-13, at 1). "Under the FLSA, and other similar fee-shifting statutes, the costs that may be charged to losing defendants include those reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services." *Gaither*, 2020 WL 2614783, at *13 (citation modified). Plaintiff's costs are reasonable expenses, and accordingly, Plaintiff will be awarded $748.25 in costs.

---

[9] Plaintiff includes several requests for work done by Gabriela Alvarez: $15.00, $30.00, $45.00, $60.00, $30.00, $30.00, $45.00, $45.00, $30.00, $45.00, $30.00, $45.00, $225.00, $30.00, and $60.00. (ECF No. 58-12, at 12-18, 20, 22).

[10] $31,695.00 - $765.00 = $30,930.00

34

## IV.  Conclusion

For the foregoing reasons, Plaintiff's motion for default judgment will be granted in part and denied in part.  A separate order will follow.

                                        _____/s/_____
                                        DEBORAH K. CHASANOW
                                        United States District Judge